Daniel Sadeh, Esq.
**HALPER SADEH LLP**
667 Madison Avenue, 5th Floor
New York, NY 10065
Telephone: (212) 763-0060
Facsimile: (646) 776-2600
Email: sadeh@halpersadeh.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| MAX WEISS, | Case No: |
| Plaintiff, | |
| v. | JURY TRIAL DEMANDED |
| JERNIGAN CAPITAL, INC., JOHN A. GOOD, MARK O. DECKER, JAMES DONDERO, HOWARD A. SILVER, HARRY J. THIE, and REBECCA OWEN, | |
| Defendants. | |

Plaintiff Max Weiss ("Plaintiff"), by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys.

## NATURE OF THE ACTION

1.      This is an action against Jernigan Capital, Inc. ("Jernigan" or the "Company") and its Board of Directors (the "Board" or the "Individual Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a) and 78t(a), and Rule 14a-9 promulgated thereunder by the SEC, 17 C.F.R. § 240.14a-9, in

connection with the proposed acquisition (the "Proposed Transaction") of Jernigan by affiliates of

NexPoint Advisors, L.P. ("NexPoint Advisors").[1]

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 14(a) and 20(a) of

the Exchange Act (15 U.S.C. §§ 78n(a) and 78t(a)) and Rule 14a-9 promulgated thereunder by

the SEC (17 C.F.R. § 240.14a-9).

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28

U.S.C. § 1331, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

4.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of

the Exchange Act (15 U.S.C. § 78aa(c)) as a substantial portion of the transactions and wrongs

complained of herein had an effect in this District, the alleged misstatements entered and the

subsequent damages occurred in this District, and the Company maintains facilities in New York

and the greater New York City area.[2]

5.      In connection with the acts, conduct and other wrongs alleged in this complaint,

Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

including but not limited to, the United States mails, interstate telephone communications and the

facilities of the national securities exchange.

---

[1] On August 3, 2020, the Company entered into an agreement and plan of merger (the "Merger Agreement") with Jernigan Capital Operating Company, LLC (the "Operating Company"), NexPoint RE Merger, Inc. ("Parent") and NexPoint RE Merger OP, LLC (the "Parent OP," together with Parent, "NexPoint").

[2] *See* Jernigan Capital, Featured Time-Lapse Properties, https://jernigancapital.com/properties/ (last visited Sept. 2, 2020).

## PARTIES

6.      Plaintiff is, and has been at all relevant times hereto, an owner of Jernigan common stock.

7.      Defendant Jernigan is a self-storage REIT that "invests primarily in new or recently-constructed and opened self-storage facilities located predominately in dense urban submarkets within the top 50 United States metropolitan statistical areas." The Company is incorporated in Maryland. The Company's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol, "JCAP."

8.      Defendant John A. Good ("Good") is Chairman of the Board and the Chief Executive Officer ("CEO") of the Company.

9.      Defendant Mark O. Decker ("Decker") is a director of the Company.

10.     Defendant James Dondero ("Dondero") is a director of the Company. Defendant Dondero is the founder and president of NexPoint Advisors.

11.     Defendant Howard A. Silver ("Silver") is a director of the Company.

12.     Defendant Harry J. Thie ("Thie") is a director of the Company.

13.     Defendant Rebecca Owen ("Owen") is a director of the Company.

14.     Defendants Good, Decker, Dondero, Silver, Thie, and Owen are collectively referred to herein as the "Individual Defendants."

15.     Defendants Jernigan and the Individual Defendants are collectively referred to herein as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

**A. Background of the Company and the Proposed Transaction**

16.     Jernigan is a real estate investment trust that provides debt and equity capital to

private developers, owners and operators of self-storage facilities, with a view to own the facilities that Jernigan finances.  Jernigan invests in facilities that are "largely vertical (three to ten floors), 100% climate controlled and technologically adapted buildings," which are referred to as "Generation V facilities."

17.     According to Jernigan's 10-Q filed with the SEC on August 7, 2020, Jernigan's stated business objective has been to "deliver attractive risk-adjusted returns by investing in new Generation V self-storage facilities, primarily in urban submarkets." To that end, a majority of Jernigan's investments to date have been "first mortgage loans to finance ground-up construction of and conversion of existing buildings into new Generation V self-storage facilities." Jernigan expects to receive a fixed rate of interest on amounts loaned to develop these facilities and "up to a 49.9% interest in the positive cash flows from operations, sales and/or refinancings of self-storage facilities[.]" Jernigan has disclosed that it "typically receive[s] a right of first refusal, or ROFR, to acquire the self-storage facility upon sale" and that it "intend[s] to acquire 100% ownership of a substantial majority of the self-storage facilities that [Jernigan has] financed either through the exercise of ROFRs or through privately negotiated transactions with [Jernigan's] investment counterparties[.]"

18.     On August 3, 2020, Jernigan issued a press release announcing that it had entered into a definitive merger agreement with an affiliate of NexPoint Advisors under which it would be acquired in an all-cash transaction.

19.     Under the terms of the agreement, holders of Jernigan's common stock and holders of units of operating company interests in Jernigan Capital Operating Company, LLC would receive $17.30 per share/unit in cash. Holders of Jernigan's Series B preferred stock would receive cash equal to $25.00 per share plus all accrued dividends (whether or not authorized or declared)

up to, but excluding, the date the merger is consummated.

20.    NexPoint and their affiliates collectively beneficially own all of the issued and outstanding shares of series A preferred stock of the Company.

21.    The press release announcing the Proposed Transaction states, in pertinent part:

### Jernigan Capital to be Acquired by a NexPoint Advisors, L.P. Affiliate for $17.30 per Share in an All Cash Deal

August 03, 2020 08:00 AM Eastern Daylight Time

MEMPHIS, Tenn.--(BUSINESS WIRE)--Jernigan Capital, Inc. (NYSE: JCAP) ("JCAP" or the "Company"), an owner of self-storage facilities and a leading capital partner for self-storage entrepreneurs nationwide, today announced that it has entered into a definitive merger agreement with an affiliate of NexPoint Advisors, L.P. (together "NexPoint") under which it will be acquired by NexPoint in an all-cash transaction valued at approximately $900 million, including debt and preferred stock to be assumed or refinanced (the "Merger Agreement"). The agreement has been unanimously approved by the Company's Board of Directors. The transaction was recommended to the Company's Board of Directors by a Transaction Committee consisting of all directors (other than Jim Dondero, founder and President of NexPoint) established to evaluate the transaction.

Under the terms of the Merger Agreement, holders of JCAP's common stock and holders of units of operating company interests in Jernigan Capital Operating Company, LLC will receive $17.30 per share/unit in cash. This represents a 30% premium over the 90-day volume-weighted average share price ending July 31, 2020 and a 23% premium over the July 31, 2020 closing share price. Holders of the Company's Series B preferred stock will receive cash equal to $25.00 per share plus all accrued dividends (whether or not authorized or declared) up to, but excluding, the date the merger is consummated.

"Since our initial public offering in March of 2015, we have built from the ground up a best in class portfolio of newly constructed Generation V self-storage facilities in some of the best submarkets in the United States, along with a development platform that is the first of its kind in our sector," said John Good, JCAP's Chief Executive Officer and Chairman. "We believe this transaction with NexPoint validates the quality of the portfolio of self-storage properties and the corporate platform we have built and accomplishes the goal of maximizing value for our stockholders during a very difficult time for all of us. We are certain today's announcement is in the best interests of all of JCAP's stakeholders."

"NexPoint has long admired and supported Jernigan Capital's unique self-storage business model and platform," added Jim Dondero, NexPoint's founder and

President. "We plan to build on this vision as a private company, maintaining unparalleled asset quality and continuing the current growth trajectory. With our combined expertise, scale and financial strength, we are well positioned to execute this vision and further expand the Company's national footprint."

The transaction, which is currently expected to close in the fourth quarter of 2020, is subject to customary closing conditions, including the approval of JCAP's stockholders, who will vote on the transaction at a special meeting on a date to be announced. The transaction is not contingent on receipt of financing by NexPoint. Under the Merger Agreement, Jernigan Capital will discontinue its regular quarterly dividends.

Jefferies LLC is serving as exclusive financial advisor, and King & Spalding is serving as legal advisors to Jernigan Capital. Raymond James and KeyBanc Capital Markets are serving as financial advisors, and Winston & Strawn LLP is serving as legal advisors to NexPoint.

As a result of today's announcement, the Company does not expect to host a conference call and webcast to discuss its financial results for the quarter ended June 30, 2020 but will announce earnings after the market close on August 6, 2020.

### About Jernigan Capital, Inc.

Jernigan Capital is a New York Stock Exchange-listed real estate investment trust (NYSE: JCAP) that provides debt and equity capital to private developers, owners and operators of self-storage facilities with a view to eventual outright ownership of facilities the Company finances. Our mission is to maximize shareholder value by accumulating a multi-billion dollar investment portfolio consisting of the newest, most attractive and best located self-storage facilities in the United States through a talented and experienced team demonstrating the highest levels of integrity, dedication, excellence and community.

### About NexPoint Advisors, L.P.

NexPoint Advisors, L.P. ("NexPoint") is a registered investment adviser to a suite of funds and investment offerings, including a closed-end fund, a business development company, an interval fund, and various real estate vehicles. NexPoint is part of a multibillion-dollar global alternative investment platform. For more information visit *www.nexpointgroup.com*.

22.      On August 20, 2020, Defendants caused to be filed with the SEC a Preliminary Proxy Statement on Schedule 14A (the "Proxy Statement") in connection with the Proposed Transaction.

**B. The Proxy Statement Contains Materially False and Misleading Statements and Omissions**

23.     The Proxy Statement, which recommends that Jernigan shareholders vote in favor of the Proposed Transaction, omits and/or misrepresents material information concerning: (i) Jernigan's financial projections; (ii) the financial analyses performed by Jernigan's financial advisor, Jefferies LLC ("Jefferies"), in connection with its fairness opinion; (iii) potential conflicts of interest involving Jefferies; and (iv) the sales process leading up to the Proposed Transaction.

24.     The omission of the material information (referenced below) renders the following sections of the Proxy Statement false and misleading, among others: (i) Background of the Mergers; (ii) Reasons for the Mergers; (iii) Opinion of our Financial Advisor; and (iv) Financial Projections.

25.     Plaintiff may seek to enjoin the anticipated shareholder vote on the Proposed Transaction unless and until the material misstatements and omissions (referenced below) are remedied. Unless remedied, Jernigan shareholders will be forced to make a voting decision on the Proposed Transaction without full disclosure of all material information. In the event the Proposed Transaction is consummated, Plaintiff seeks to recover damages resulting from Defendants' misconduct.

**1. Material Omissions Concerning Jernigan's Financial Projections**

26.     The Proxy Statement omits material information concerning Jernigan's financial projections.

27.     According to the Proxy Statement, the Company's management prepared and provided the Company's projections to the Board on a consolidated basis for 2020 through 2024, which was used by Jefferies in connection with its fairness opinion (the "Projections").

28.     The Proxy Statement, however, fails to disclose the following concerning the

Projections: (1) all line items used to calculate: (i) owned net operating income, (ii) EBITDA, (iii) net income, (iv) unlevered free cash flow, and (v) funds from operations; and (2) a reconciliation of all non-GAAP to GAAP metrics.

29.     The disclosure of the aforementioned projected financial information is material because it would provide Jernigan shareholders with a basis to project Jernigan's future financial performance and would allow shareholders to better understand the financial analyses performed by the Company's financial advisor in support of its fairness opinion. Shareholders cannot hope to replicate management's inside view of the future prospects of the Company. Without such information, which is uniquely possessed by Jernigan and its financial advisor, the Company's shareholders are also unable to determine how much weight, if any, to place on the Company's financial advisor's fairness opinion in determining whether to vote for or against the Proposed Transaction.

30.     When a company discloses non-GAAP financial metrics in a Proxy Statement that were relied upon by its board of directors in recommending that shareholders exercise their corporate suffrage rights in a particular manner, the company must also disclose, pursuant to SEC Regulation G, all projections and information necessary to make the non-GAAP metrics not misleading, and must provide a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial metrics disclosed or released with the most comparable financial metrics calculated and presented in accordance with GAAP. 17 C.F.R. § 244.100.[3]

_____

[3] Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), https://www.sec.gov/news/speech/chair-white-icgn-

31.     Accordingly, in order to cure the materially misleading nature of the aforementioned financial projections, Defendants must provide a reconciliation table of the aforementioned non-GAAP metrics to their most comparable GAAP metrics. Defendants must also disclose the line item projections that were used to calculate these metrics. Such projections are necessary to make the non-GAAP projections included in the Proxy Statement not misleading.

32.     The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to Jernigan shareholders.

### 2.   Material Omissions Concerning Jefferies's Financial Analyses

33.     In connection with the Proposed Transaction, the Proxy Statement omits material information concerning analyses performed by Jefferies.

34.     With respect to Jefferies's "*Selected Public Company Analysis*" and "*Selected Precedent Transactions Analysis*," the Proxy Statement fails to disclose the individual multiples and financial metrics for the companies and transactions observed by Jefferies in its analyses.

35.     The Proxy Statement fails to disclose the following concerning Jefferies's "*Net Asset Value Analysis*": (1) the cash flow for owned properties and development investments and all underlying line items, as used in the analysis; (2) the projected fair value of development investments; (3) the terminal values used in the analysis; (4) Jefferies's basis for applying a range of exit capitalization rates of 5.1% to 5.5% for the Company's owned and acquired real estate assets; and (5) the individual inputs and assumptions underlying the discount rates of 9.5% to

---

speech.html (footnotes omitted) (last visited Sept. 2, 2020) ("And last month, the staff issued guidance addressing a number of troublesome practices which can make non-GAAP disclosures misleading: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data. I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures.").

10.8%.

36.     The Proxy Statement fails to disclose the following concerning Jefferies's "*Discounted Cash Flow Analysis*": (1) all line items used to calculate the unlevered free cash flows; (2) the individual inputs and assumptions underlying the discount rates ranging from 9.5% to 10.8%; and (3) the total debt, preferred equity, cash and cash equivalents.

37.     With respect to Jefferies's analysis of premiums paid, the Proxy Statement fails to disclose: (1) the transactions observed by Jefferies in its analysis; and (2) the premiums paid in the transactions.

38.     The valuation methods, underlying assumptions, and key inputs used by Jefferies in rendering its purported fairness opinion must be fairly disclosed to Jernigan shareholders. The description of Jefferies's fairness opinion and analyses, however, fails to include key inputs and assumptions underlying those analyses. Without the information described above, Jernigan shareholders are unable to fully understand Jefferies's fairness opinion and analyses, and are thus unable to determine how much weight, if any, to place on them in determining whether to vote for or against the Proposed Transaction. This omitted information, if disclosed, would significantly alter the total mix of information available to Jernigan shareholders.

**3.  Material Omissions Concerning Potential Conflicts of Interest Involving Jefferies**

39.     The Proxy Statement omits material information concerning potential conflicts of interest involving Jefferies.

40.     The Proxy Statement provides the following concerning Jefferies's prior work for the Company, NexPoint, and their affiliates:

> Jefferies has, in the past, provided financial advisory and financing services to the Company and has received fees for the rendering of such services. In the two years prior to the date of its opinion, Jefferies has received fees in the aggregate amount of approximately $2.4 million for the rendering of financial advisory or advisory

services to NexPoint. In addition, Jefferies has, in the past, provided financial advisory and financing services to a certain affiliate of NexPoint and has received $0.4 million in fees for the rendering of such services.

41.     The Proxy Statement, however, fails to disclose: (1) the specific nature of the services Jefferies provided to the Company and the amount of fees it received for rendering such services within the two years prior to the date of Jefferies's opinion; and (2) the timing and nature of past services Jefferies provided to NexPoint and Nexpoint Advisors and all their affiliates, as well as the compensation it received, in the two years prior to the date of Jefferies's opinion.

42.     Disclosure of a financial advisor's compensation and potential conflicts of interest to shareholders is required due to their central role in the evaluation, exploration, selection, and implementation of strategic alternatives and the rendering of any fairness opinions. Disclosure of a financial advisor's potential conflicts of interest may inform shareholders on how much weight to place on that analysis.

43.     The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to Jernigan shareholders.

**4.  Material Omissions Concerning the Sales Process Leading up to the Proposed Transaction**

44.     The Proxy Statement omits material information concerning the sales process leading up to the Proposed Transaction.

45.     The Proxy Statement provides that the Company entered into non-disclosures agreements with various parties, including, but not limited to, Party A, Party B, Party C, and Party D.

46.     The Proxy Statement, however, fails to disclose the terms of all non-disclosure agreements, including whether such agreements contained standstill provisions with "don't ask, don't waive" (DADW) provisions (including their time of enforcement) that would preclude

interested parties from making superior offers for the Company.

47.    Without this information, Jernigan shareholders may have the mistaken belief that potential buyers are or were permitted to submit superior proposals for Jernigan, when in fact they are or were contractually prohibited from doing so. This information is material because a reasonable Jernigan shareholder would want to know, prior to voting for or against the Proposed Transaction, whether other potential buyers are or were foreclosed from submitting a superior proposal.

48.    The Proxy Statement provides that on May 28, 2020, Party C disclosed to Defendant Good "the maximum exchange ratio per share of the Company common stock that Party C was willing to consider in connection with the potential merger" with the Company.

49.    The Proxy Statement, however, fails to disclose the maximum exchange ratio presented by Party C and its value.

50.    On May 12, 2020, the Board approved the formation of a transaction committee to consider whether to pursue a strategic transaction with NexPoint or others and to report its recommendation to the Company's Board for approval. The Proxy Statement states, in relevant part:

> Given that NexPoint had submitted a proposal and its affiliate, as the Series A Preferred stockholder, had elected a director to the Company's board (James Dondero), the board of directors, cognizant of avoiding any potential conflict of interest, unanimously approved the formation of a transaction committee of all the members of the board of directors other than Mr. Dondero, which we refer to as the Transaction Committee. The Transaction Committee, comprised of Mr. Good, Mark Decker, Howard Silver, Harry Thie and Rebecca Owen, was authorized to consider whether to pursue a strategic transaction with NexPoint or other potential parties and to report its recommendation concerning any potential transaction to the Company's board of directors for approval.

51.    The Proxy Statement, however, fails to disclose the reasons the Board's transaction committee was not apparently authorized to and did not retain its own independent financial and

12

legal advisors.

52.     The Proxy Statement provides that the Company "did not provide Party D with access to the virtual data room [as of June 24, 2020 when the parties entered into a non-disclosure agreement] due to the Company's ongoing discussions with Party C and NexPoint and the continued activity by each of Party C, NexPoint and their respective advisors in the virtual data room."

53.     The Proxy Statement, however, fails to adequately disclose the reasons Defendants did not provide Party D with access to the virtual data room as of June 24, 2020 in light of the fact the Company had not entered into an exclusivity agreement with NexPoint or Party C at the time.

54.     The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to Jernigan shareholders.

**COUNT I**
**For Violations of Section 14(a) and Rule 14a-9 Promulgated Thereunder**
**Against All Defendants**

55.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

56.     During the relevant period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false and misleading Proxy Statement specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder by the SEC.

57.     Each of the Individual Defendants, by virtue of his/her positions within the Company as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a) of the Exchange Act. Defendants, by use of the mails and means and instrumentalities of interstate commerce, solicited and/or permitted the use

of their names to file and disseminate the Proxy Statement with respect to the Proposed Transaction. The Defendants were, at minimum, negligent in filing the materially false and misleading Proxy Statement.

58.     The false and misleading statements and omissions in the Proxy Statement are material in that a reasonable shareholder would consider them important in deciding how to vote on the Proposed Transaction.

59.     By reason of the foregoing, Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

60.     Because of the false and misleading statements and omissions in the Proxy Statement, Plaintiff is threatened with irreparable harm.

**COUNT II**
**Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

61.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

62.     The Individual Defendants acted as control persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their senior positions as officers and/or directors of the Company and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement filed with the SEC, they had the power to and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the false and misleading Proxy Statement.

63.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the

statements or cause the statements to be corrected. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Proxy Statement, and to correct promptly any public statements issued by the Company which were or had become materially false or misleading.

64.     In particular, each of the Individual Defendants had direct and supervisory involvement in the operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. The Individual Defendants were provided with or had unlimited access to copies of the Proxy Statement and had the ability to prevent the issuance of the statements or to cause the statements to be corrected. The Proxy Statement at issue contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction. Thus, those Individual Defendants were directly involved in the making of the Proxy Statement.

65.     In addition, as the Proxy Statement sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Proposed Transaction. The Proxy Statement purports to describe the various issues and information that they reviewed and considered—descriptions which had input from the Individual Defendants.

66.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

67.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 promulgated thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' conduct, the Company's

shareholders will be irreparably harmed.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.      Preliminarily and permanently enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction and any vote on the Proposed Transaction, unless and until Defendants disclose and disseminate the material information identified above to the Company's shareholders;

B.      In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C.      Declaring that Defendants violated Sections 14(a) and 20(a) of the Exchange Act, and Rule 14a-9 promulgated thereunder;

D.      Awarding Plaintiff reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E.      Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: September 2, 2020                                Respectfully submitted,

                                                       **HALPER SADEH LLP**

                                                       By: /s/ Daniel Sadeh
                                                       Daniel Sadeh, Esq.
                                                       Zachary Halper, Esq. (to be admitted *pro hac vice*)
                                                       667 Madison Avenue, 5th Floor
                                                       New York, NY 10065
                                                       Telephone: (212) 763-0060
                                                       Facsimile: (646) 776-2600

Email: sadeh@halpersadeh.com
zhalper@halpersadeh.com

*Counsel for Plaintiff*